OPINION
{¶ 1} This is an appeal from a Franklin County Court of Common Pleas, Division of Domestic Relations, judgment that, inter alia, allocated the parental rights and responsibilities of Garold Newbold, defendant below and appellant/cross-appellee ("appellant" herein), and Elizabeth Dannaher, plaintiff below and appellee/cross-appellant ("appellee" herein). The court designated appellee the primary residential parent and legal custodian of the parties' child, Olivia Rose Newbold, born June 30, 1997.
 {¶ 2} Appellant raises the following assignments of error for review:
Assignment of Error No. 1
The trial court erred and abused its discretion by failing to adopt the parties' stipulations concerning the issues of school placement and the holiday parenting time schedule.
Assignment of Error No. 2
The trial court erred as a party [sic] of law when it created an automatic rebutta[ble] presumption that weekday parenting time would not be in the child's best interest once she commenced school and engaged in an anticipatory termination of defendant's weekday parenting time rights.
Assignment of Error No. 3
The trial court erred as a matter of law when it included a restraining order preventing any person from smoking around the minor child when there was no such evidence that the minor child had ever been subjected to cigarette smoke by any parent or person.
Assignment of Error No. 4
The trial court erred and abused it[s] discretion by designating appellee as the child's custodian and rejecting shared parenting as such determinations were contrary to the child's best interests and against the manifest weight of the evidence.
Assignment of Error No. 5
The trial court erred as a mat[t]er of law when it imputed income to appellant for child support purposes without any evidence being presented pursuant to R.C. 3119.
Assignment of Error No. 6
The trial court erred as a matter of law when it ordered that any medical insurance costs would be without set-off of child support.
Assignment of Error No. 7
The trial court erred and abused its discretion by awarding appellee $50,400.00 in attorneys fees.
 {¶ 3} Appellee raises the following cross-assignment of error for review:
The trial court erred by failing to designate the award of attorney's fees as spousal support pursuant to R.C. 3105.18(H).
 {¶ 4} The parties married on November 4, 1996. The union produced one child, Olivia Rose Newbold. After their marriage, the parties lived in Thornville, Ohio, with their newborn child and appellee's older son from a prior relationship, Adam. Thornville is located approximately 40 miles east of Columbus.
 {¶ 5} After Olivia's birth, appellee, a paralegal employed by a Columbus law firm, took time off work to care for Olivia. Appellant, a self-employed attorney, also played an integral role in Olivia's upbringing. Both appellee and appellant developed a strong and loving relationship with their newborn daughter.
 {¶ 6} After appellee returned to work, the parties placed Olivia in daycare at Columbus State. In 1998, the parties switched Olivia's daycare to Learning Enrichment in Pickerington. Learning Enrichment is located approximately mid-way between Columbus and Thornville.
 {¶ 7} On June 19, 1999, the parties separated. Appellant moved to the home he has owned for approximately 20 years, located on Lincoln Street in the Short North area of Columbus. Following their separation, the parties agreed to a parenting arrangement:
Both parents shall be considered residential parents and legal custodians of the child.
Father has the child alternating weekends, picking up the child from daycare/school on Friday afternoon and returning the child to daycare/school on Monday morning; every Tuesday after daycare/school, returning the child to the Mother on Wednesday evening, until the child is in school, at which time the Father will return the child Wednesday morning to her school; every weekday, the Father picks up the child from daycare/school and returns to Mother at 6:15 P.M. at a neutral location near Mother's workplace.
Mother has the child at times not specified above, and from Friday at 6:15 P.M. every other weekend to Monday morning when she returns the child to daycare/school; Mother also has companionship on Monday, Wednesday and Thursday of every week from 6:15 P.M. until returning the child to daycare/school the following morning.
 {¶ 8} On September 8, 1999, appellee filed a complaint for divorce. She requested that the court designate her as Olivia's residential parent and legal custodian, or, alternatively, shared parenting. Appellant subsequently filed a cross-complaint for divorce and requested the court to designate him as Olivia's residential parent and legal custodian. The parties eventually resolved almost all issues except the issues surrounding child custody and support.
 {¶ 9} On October 11, 2000, the trial court appointed Dr. Kevin D. Arnold, a psychologist, to perform evaluations of appellant, appellee, and Olivia. In his October 10, 2001 report, Dr. Arnold concluded that a shared parenting plan could work, but he further noted that the parties exhibit a hostile relationship.[1] Dr. Arnold stated:
1. The issues in this case are not uncommon, according to research, in the cases of divorce that are characterized by these hostile and conflicted patterns between the parents. Both parents believe that the other has serious flaws, and this belief is likely held by each parent when they are viewing each other in the context of former spousal roles. But these flaws are in the context of their unique dynamics as former spouses, not in their roles as separate parents. Of most concern is their perpetuation of these conflicts through both litigation, and discussions with Olivia. The exposure of Olivia to these hostilities * * * suggests that she will be at further risk of developing adjustment problems as she grows older. The main issue, regarding the psychological best interest of the daughter in this family, is the protection of Olivia from exposure to the on-going conflicts that are likely to continue between [appellant] and [appellee] when they attempt to interact regarding their daughter's care and rearing.
2. When alone with Olivia, each parent is able to display impulse control, capacity to adapt to her needs, and to empathize with her. When together, they appear to be unable to avoid hostility, as well as failing to control their impulses, and are unable [to] consider their daughter's feelings rather than their own positions when conflicting. * * *
* * * Olivia's best interest would not, in my opinion, be well served by exposing her to the hostilities and conflicts that characterize the interactions between the parents; those interactions often, if not almost exclusively, [are] the result of attempts to cooperate as parents regarding Olivia's needs. Typical shared parenting plans often can provide opportunities, inadvertently, for children to be exposed to the conflicts; but these types of hostile patterns of inter-parental conflicts are not necessarily, in my opinion, a reason to predict failure for shared parenting. In my opinion, it is possible to create a shared parenting plan and companionship schedule that could meet Olivia's needs both for a relationship with each parent, and for a minimization of her exposure to the inter-parental hostilities and conflicts.
The model of shared parenting that would better serve Olivia's best interest should not, however, require anything beyond minimal amounts of cooperation regarding decisions about unanticipated variations * * * to the court-approved parenting plan. * * *
 {¶ 10} Dr. Arnold related his belief that:
* * * [I]f a shared parenting [plan] does not contain a comprehensive set of details for how the plan will be implemented, then the plan will foster more opportunities for both (a) hostility between the parents and (b) exposure of Olivia to those hostilities. These hostilities and conflicts will result from each parent's apparent inability to cooperate with each other regarding their daughter's well-being. The research * * * indicates that there is reason to believe that these two parents will continue to experience high degrees of both conflict and hostility toward one another when trying to work together, even on their daughter's needs. When these conflicts and hostilities arise, I predict that the results will include exposure of Olivia to the conflicts and hostilities, boding poorly for her potential to adjust healthily to the divorce. I recommend that the alternative model of parallel parenting to be considered. [Parallel parenting is described as]:
"Even though much of the divorce literature focuses on coparenting, in which parents communicate and work with each other, to raise * * * their children in a cooperative fashion, high-conflict families fail miserably at this task. Each parent usually thinks his or her style is the only way to parent, and both parents are often quite critical of the other. Interactions stimulate the conflict, reducing benefits to the children.
"The goals of parallel parenting are to reduce the level of conflict and make sure that the tasks of parenting are accomplished by one or both parents. It is important for parents, in conjunction with the courts, a neutral decision maker, or both, to specify which parent is responsible for various parenting tasks. Parents develop a plan that identifies how each parent will participate in the child's extracurricular activities, help with schoolwork, take care of medical needs, and so on. Plans are developed to ensure that the parents communicate with each other with less conflict. * * *"
 {¶ 11} On May 13, 2002, appellant filed a proposed shared parenting plan. Appellant proposed having Olivia: (1) each Tuesday and Thursday from after school/3:00 p.m., until the following morning when school begins/9:00 a.m.; and (2) alternate weekends from Friday after school/3:00 p.m., until the following Monday when school beings/9:00 a.m. His plan further proposed that the standard parenting guidelines of Loc.R. 27 apply in all other respects.
 {¶ 12} On June 21, 2002, appellee filed a proposed custody and parenting time arrangement. She proposed that the child reside primarily with her and that appellant have the following parenting time: (1) every other Friday from 6:00 p.m., until Sunday at 6:00 p.m.; and (2) every Tuesday evening from 3:00 p.m., until 6:00 p.m. Appellee proposed that the parties alternate spring breaks. For Christmas, appellee suggested that: (1) appellant have the child every Christmas Eve from 10:00 a.m., until 9:00 p.m.; (2) appellee have the child from 9:00 p.m., Christmas Eve until 10:00 a.m., December 26; and (3) beginning December 26, the normal schedule apply.
 {¶ 13} On July 8, 2002, the guardian ad litem filed a "second preliminary report." The guardian ad litem did not view shared parenting as an option that would serve Olivia's best interests. He stated that the parents lack the capacity to work together: "They have a continuing rage against each other." He asserted: "It must be terribly difficult for Olivia on a daily basis to be exposed to the continual pummeling between her mother and father." The guardian ad litem noted that Dr. Arnold's report indicates that exposing Olivia to the parents' hostilities "suggests that she will be at further risk of developing adjustment problems as she grow[s] older." The guardian ad litem believed that:
* * * [I]f shared parenting is ordered, the disagreements between the parties will be endless. The mother will want Olivia to play ball in Thornville, where she resides; the father will want the child to play ball in Columbus where he resides. The mother will want a doctor near her home, the father a doctor near his home. The mother will want music lessons in Perry County, the father in Columbus. One parent needs to have the legal authority to make these kind of decisions. Otherwise, Olivia will be in the middle of continual disagreements.
 {¶ 14} The guardian ad litem concluded that Olivia's best interests will be served if appellee is designated the residential parent and legal custodian: "[The child] is bonded with her mother. The Thornville home is the only one she has known. She needs this home base." The guardian ad litem related his belief that the Thornville area is a better suited area for raising a child than the Columbus Short North area where appellant resides. The guardian ad litem also expressed his concern about the travel time between the parents' homes. With respect to appellant's parenting time, the guardian ad litem stated that one weekday overnight visit with appellant would be acceptable, but that two would not serve the child's best interest.
 {¶ 15} On July 10, 2002, the parties filed "stipulations," in which they agreed to a marital property division and an allocation of debts and expenses. The parties further agreed that no spousal support is required.
 {¶ 16} Beginning on July 8, 2002, the trial court conducted a hearing. At the hearing, appellee stated that she found appellant's plan "unacceptable":
A. It means that Olivia would sleep at a different house Monday through Friday every night. I think that that would be completely disrupting to her, that she would not get enough rest. That would create a feeling of insecurity and bouncing back and forth between houses. It's like she would be a nomad on the move all the time without actually bonding to either residence. In addition to that, I think that [appellant] and I have very different parenting styles. And Olivia would have to — she'd be exposed to my parenting style one day, [appellant]'s parenting style the next day and revert back and forth like that and it could be very confusing to her. * * *
(Tr. Vol. I, at 61.)
 {¶ 17} Appellee further maintained that, after staying overnight at appellant's home, Olivia is "extremely tired, irritable. I've noticed nervous behaviors that I would attribute to lack of rest, irritability. And without exception, I barely make it out of the parking garage and she's asleep and sleeps for an hour on the way home." (Tr. Vol. I, at 62-63.)
 {¶ 18} Appellee testified that under appellant's proposed plan, Olivia "would be travelling from Thornville * * * to Pickerington or Reynoldsburg to Columbus and then to any other extracurricular activities." (Tr. Vol. I, at 65.) She claimed that under appellant's plan, Olivia would travel approximately 450 miles per week. Appellee further testified that she disagreed with appellant's option of alternating weekends from Friday after school until the following Monday when school begins at 9:00 a.m. She stated that she does not believe that it gives the child "a good start for Monday." (Tr. Vol. I, at 63.) Appellee thinks the weekend should end Sunday night.
 {¶ 19} Appellee also disagreed with appellant's plan because "[w]e have to have a definitive decision maker. [Appellant] and I cannot agree on anything. And if we can't agree on anything, it just le[a]ds to conflict." (Tr. Vol. I, at 67.) Appellee further related that appellant's plan would not resolve the problems they have had concerning Olivia's extracurricular activities:
A. We've had continuing problems since August of 1999. [Appellant] signs her up for extracurricular activities, I'm not notified of them and that would include gymnastics, music. He signed her up for cheerleading in 2001 and I was never notified of it. And what made that so disturbing was it was on Saturdays. I would have taken Olivia on the Saturdays that I had her had I known about it and had I known that that was important to Olivia. In addition to that, he schedules these current — extracurricular activities multiple times during the week so she appears to be at times to be an overscheduled child.
(Tr. Vol. I, at 64.)
 {¶ 20} Appellee noted that, because they arrive home at 7:15 or 7:30 p.m., Olivia cannot participate in extracurricular activities.
 {¶ 21} Appellee also believes that appellant has attempted to reduce her participation in some extracurricular activities.
 {¶ 22} Appellee testified that, under the parties' current arrangement, appellant picks Olivia up sometime after 3:00 p.m., Monday through Friday and drops Olivia off at appellee's workplace at 6:15 p.m., except for Tuesdays, which is his overnight. They alternate weekends. Appellee stated that she does not see this as a viable alternative in the future:
A. [A] 6:15 drop off in downtown Columbus is too late for a little girl. We don't get home until 7:15 and I'm rushing around trying to get dinner for her. She eats between 7:30 and a quarter to 8:00. Then we rush in and try to get a bath and try to get to bed between 8:30 and 9:00.
(Tr. Vol. I, at 200-201.)
 {¶ 23} Appellee stated that, under her proposed parenting plan, she would be the residential parent and sole legal custodian. She stated that Olivia needs "one decision maker so that Olivia is not placed in this constant turmoil." (Tr. Vol. I, at 68.) Appellee maintained that she is the best person to serve as the primary decision maker.
 {¶ 24} Appellee testified that: "[Appellant] goes into rages. His erratic behavior would be concerning decisions. He's very easily upset. He has episodes where he just is kind of in a trance and not communicating or functioning well, I would say. He's very violent." (Tr. Vol. I, at 92.)
 {¶ 25} Appellee stated that, under her plan, appellant would have Olivia: (1) every other Friday beginning at 6:00 p.m., and ending Sunday at 6:00 p.m.; and (2) every Tuesday evening from 3:00 p.m., until 6:00 p.m.
 {¶ 26} Appellee believes that her plan furthers Olivia's best interests because "[the child will] have continuing contact with [appellant], but she'll also be able to go home, get a good night's rest, not be disrupted and at a decent time. As it currently stands, we don't roll in the door until 7:15 or 7:30." (Tr. Vol. I, at 69.) Appellee stated that she believes that her proposal "provides for a stable, normal routine," while appellant's proposal does not. (Tr. Vol. I, at 71.) With respect to Olivia's interaction and interrelationship with her parents, appellee stated that she does not have any personal knowledge of Olivia's relationship with appellant after January of 2000. Appellee related that she believes that she has a close relationship with Olivia. She explained that they cook, work with the computer, write numbers, play hop scotch, and spell words. Appellee also stated that Olivia shares a loving relationship with appellee's older son, Adam, and that Olivia enjoys visiting appellee's sister and mother.
 {¶ 27} Regarding Olivia's adjustment to her home, school and community, appellee stated that Olivia has always lived in Thornville and in the same house. Appellee explained that the house, a 19th century brick Victorian home, is approximately 3,600 square feet in size and is located on an acre of land in the middle of Thornville. Olivia has a play room downstairs. Appellee noted that Olivia has friends in Thornville within walking distance and that Olivia also has friends at Learning Enrichment. Appellee testified that Olivia does not have any friends in appellant's immediate neighborhood and that she does not believe that Olivia feels "at home at her father's residence." (Tr. Vol. I, at 275.)
 {¶ 28} Appellee stated that Olivia participates in a tap class, visits the swimming pool every other weekend, and visits the library, which is located next to her home. Appellee stated that she would like Olivia to continue to attend Learning Enrichment until she enters kindergarten. Olivia has attended Learning Enrichment since November of 1998, and is familiar with the people who work there. Once Olivia begins kindergarten, she can attend Learning Enrichment after school. Appellee registered Olivia to begin kindergarten at St. Pius in the fall of 2003. If for some reason Olivia is unable to attend St. Pius, she would enroll Olivia at Thornville Elementary, which is less than one block from appellee's home.
 {¶ 29} Appellee stated that she did not want Olivia to attend St. Joseph Montessori, a school appellant had recommended, because the tuition, not including any before or after school care, is approximately $6,000 per year. She also noted that St. Joseph is located in a "very bad neighborhood." (Tr. Vol. I, at 191.) She claims that "gang tags" are on the building, playground equipment, and street signs that surround the school, and that the children are locked in the building and that one needs a code to open the door. (Tr. Vol. I, at 191.) She noted that the children who attend St. Joseph are the children of parents who work downtown and come from all over the Columbus area. There is, appellee asserts, "no sense of community" in the school. (Tr. Vol. I, at 193.)
 {¶ 30} Appellee also testified that the guardian ad litem's assessment that the bitterness will not end between the parties is accurate. She does not believe that she and appellant have the ability to cooperate and to make decisions jointly. The parties apparently do not agree on medical care decisions, the payment for medical care, extracurricular activities, school, and when Olivia should begin school. She testified: "I can't think of anything that we do agree on." (Tr. Vol. I, at 105.) She also stated that they have not agreed on inoculations and vaccinations. Appellee "requested that Olivia not receive a chicken pox vaccine because there's still some questions about that vaccine. [Appellant] knew of my wishes and had her vaccinated anyway." (Tr. Vol. I, at 110.) Appellee claimed that appellant "has misled [her] and not notified [her] of doctors' appointments." (Tr. Vol. I, at 110.)
 {¶ 31} Appellee did state that she believes that both she and appellant will honor and facilitate visitation, as long as the order is clearly defined. Appellee testified that she has the ability to encourage the sharing of love, affection and contact between Olivia and appellant. She does not, however, believe that appellant possesses a similar ability. "[Appellant] turns everything with Olivia into a competition between he and I." (Tr. Vol. I, at 117.) She stated that appellant keeps notes of whose lap the child likes to sit on. She also testified that, when Olivia was an infant, appellant purchased a cot and slept next to Olivia's crib.
 {¶ 32} Appellee stated that, when she returned to work after her maternity leave, appellant became "very controlling of Olivia's time":
* * * [C]onfrontational with me to the point where if I called and said, you know, I'm going to go drop Olivia off, we would literally have races to the day care to see who could get there first. If for some reason he were going to, you know, I did pick her up then he would continually call the day care to make sure that I did pick her up. I mean, I'd get off the phone with him and say I'm going to pick her up and I'd be there and he'd be calling. * * *
(Tr. Vol. I, at 94-95.)
 {¶ 33} Regarding whether appellant has a history or potential for child abuse, spousal abuse, or other domestic violence, appellee stated that appellant has been violent with her in the past. She testified that the first violent episode occurred in November 1998:
A. Olivia had gotten up during the night. And at this point [appellant] had moved the cot next to Olivia's crib. And I went in to get Olivia and he pushed me from the bedroom and I fell into the hallway and he was yelling at me and he told me that as soon as I learned that Olivia was his daughter, things would be better.
(Tr. Vol. I, at 119.)
 {¶ 34} The next event occurred around Christmas in 1998. Appellee contended that appellant pushed her and she eventually fell backwards and hit her back on the floor. Appellant dragged appellee on the floor until her robe ripped.
 {¶ 35} Appellee also testified that, in January of 1999, appellant pushed appellee to the floor. Appellee told appellant that she intended to call the police and that appellant stated that, if she notified the police, he would also assert that she committed domestic violence against him.
 {¶ 36} Appellee testified that another violent incident occurred on Martin Luther King Day in 1999. She stated that, as she held Olivia and said goodbye to appellant, appellant walked into the driveway then "rac[ed] back into the house" and pushed her. (Tr. Vol. I, at 122.) Appellee then yelled for her son, Adam, to come downstairs. Appellee testified:
* * * [Adam] got between [appellant] and me and [appellant] raised his fist to him to hit him and I put Olivia down and I stood between [appellant] and Adam and I told * * * [appellant] he was never going to hit one of my kids, he was going to hit me first. And [appellant] stopped then, so I grabbed Olivia back up and I took Olivia and Adam up the stairs and we went into a back bathroom. And [Adam] was trying to keep the bathroom door shut and [appellant] was charging up against the bathroom door. And I thought that [Adam] was going to get caught between the door and the wall because [appellant] is much bigger than [Adam]. And I was trying to calm [appellant] down.
And I got [appellant] to the point where we could get the bathroom door open, I thought. And we opened the bathroom door and we all started to walk down the hallway and he started pushing me again. I had Olivia. So I took both kids into my son Adam's bedroom because there's a phone in there. And [appellant] was banging on the door, my son was trying to keep it shut and I picked up the phone and I said Gary I'm calling the police, walk away from the door. Phone went dead, [appellant] had ripped the phone out of the jack in the hallway and so I was stuck up on the second floor with two kids. So I told [appellant] I'd go downstairs with him if he would just leave the kids alone. So he agreed to that.
So I walked out of the bedroom and I went downstairs to the kitchen and [appellant], when he looked at me in the kitchen, it's like his whole face just changed because when he was first looking at me, all of the muscles in his face was tense and his eyes seemed to be kind of glassy and his hands were like in fists. And then when I just stood there and looked at him and I was like what are you doing. He seemed to get some expression back in his face and his muscles didn't — kind of unclenched and he seemed to be normal again. * * *
(Tr. Vol. I, at 123-124.)
 {¶ 37} Appellant then left the house and, later that day, called appellee and said that he would move out.
 {¶ 38} Appellee testified that the next incident occurred in March of 1999. She testified that appellant had been viewing her financial documents without her consent. She began to put the documents back into the boxes and stated that she planned to take the documents to her office. Appellant caught or shut her in the kitchen door and told her that she "was not going to remove evidence from the house." (Tr. Vol. I, at 128.) Appellee asked appellant to stop and when she walked outside, appellant locked her out of the house for five or ten minutes.
 {¶ 39} The next incident occurred in June of 1999. Appellee testified that she and appellant argued about the amount of money in appellee's checking account and about appellant's laundry. Appellee asserted that appellant held her against a wall with his forearm and caused appellee to suffer a laryngeal contusion. Appellee told appellant that she intended to call the police and appellant blocked her access to the telephone. She eventually left the house in order to call the police. Appellant had locked the doors and appellee attempted to enter the house through a window but appellant prevented her entry.
 {¶ 40} Appellee then removed appellant's shirts from the washing machine and threw them into the trash. Appellant then threw the kitchen trash on appellee and told her that she was trash. She backed out of the kitchen and he caught her with his thumb underneath her chin and his fingers on her cheek bone and he forced her to the floor. Appellee took Olivia to the bathroom and, as appellant leaned against the bathroom door to press it on appellee, she bit appellant's arm.
 {¶ 41} Appellee then called the police, and appellant called his mother and stepfather. When appellee next saw appellant, he had scratches on his face.
 {¶ 42} The police and appellant's mother and stepfather arrived around the same time. The officers arrested both appellee and appellant for domestic violence. Appellant's mother took Olivia. After this incident, the parties agreed to exchange Olivia every 48 hours. Appellee contended, however, that the 48-hour rotation confused Olivia and that she "began to regress with baby-like behavior, wanting to take bottles * * *. She just seemed very sad. She was not happy anymore. She seemed depressed, there was no routine in her life. It was impossible to get her potty trained." (Tr. Vol. I, at 145-146.)
 {¶ 43} Appellee further stated that appellant called her three times at work. Each time she tried to talk, he would repeatedly talk over her with profanity and she would hang up the telephone. Soon, appellant would again call.
 {¶ 44} Appellant also called and paged her "repetitively." She explained that he left so many messages in her voice mail that it became full. (Tr. Vol. I, at 148.)
 {¶ 45} Appellee testified that appellant has threatened to kill her and has stated that he would run her over with his car, and that appellant carries a gun in his car.
 {¶ 46} Appellant testified that he did not initiate the domestic violence incidents and that he believed that appellee provoked confrontational transitions. Appellant also denied that he kept a gun in his car.
 {¶ 47} Leanna Collinsworth, appellant's former girlfriend who is currently in jail, testified that she retained appellant as an attorney and that they then began a personal relationship that lasted approximately six months. Collinsworth stated that some physical violence occurred in their relationship. She explained that one time, appellant dragged her down the stairs. Another time, he "picked [her] up by [her] neck" and she could not breathe. (Tr. Vol. II, at 284.) Collinsworth also stated that she saw a gun in appellant's glove box. Collinsworth testified that she heard appellant say that he wished appellee would have "a heart attack and die" and that appellant said it "[a] lot. Every other day." (Tr. Vol. II, at 292-293.) She claimed appellant also stated that he wished appellee would get in a car accident and die. Collinsworth testified that appellant talked about the custody case and told her that he did not want appellee to have the child.
 {¶ 48} Appellant's stepfather, Charles Petree, testified that appellant is a loving father who enjoys spending time with his child. Petree stated that he has observed the transitions and that, during the transitions, he saw the child:
* * * [C]hange from a very warm and loving, outgoing child when she'd be with us or with [appellant], to being totally guarded. And she acted as though she was going to be upsetting her mother if she would show any sign of affection, even as much as kissing us goodbye * * *. And she was frankly afraid to even look at us any more than possible. That hostility that was evident apparently had affected her-she had found a way to defend herself so as to not offend her mother.
(Tr. Vol. III, at 65.)
 {¶ 49} Petree thought that appellee "was very, very unrealistic in her need for somebody to observe every exchange, practically grabbing the child and pulling her to her building down here one time." (Tr. Vol. III, at 66.) He does not believe appellee "make[s] these exchanges easy on the child or any other person involved." (Tr. Vol. III, at 66.)
 {¶ 50} Terita Carey, who worked with Olivia at the Columbus State day care center, testified that she mostly interacted with appellant and that he appeared to be the primary caregiver for the child.
 {¶ 51} The guardian ad litem testified that he does not believe that shared parenting will work and that he supports appellee's request for sole custody. He explained that his:
* * * [O]pinion is primarily based upon this child's bond with her mother * * * and her home being the mother's home. And my concern, amongst other things, for Olivia were the long days she's experiencing, a lot of car travel and being in the middle of the disagreement between Mom and Dad. As young as she is, she's very much aware of the disagreement. * * *
(Tr. Vol. V, at 204-205.)
 {¶ 52} The guardian ad litem stated that a sole custody arrangement will best serve Olivia's interests.
 {¶ 53} In her August 6, 2002 written closing arguments, appellee stated that the issues are: (1) custody (sole custody vs. shared parenting); (2) parenting time; (3) child support; and (4) attorney's fees and expenses. She further argued that appellant under reported his income:
* * * He testified that his court appointed cases pay between $45-$60 an hour; however, in his deposition of April 10, 2002 he testified that he charges $150 an hour and bills about 6 1/2 hours a day. If we assume that he bills 6 hours per day on a 20 day month (therefore taking 5 weeks off per year) at $100 an hour, he would gross $144,000 a year. If he were to bill and collect a mere $50 an hour, 6 hours a day, taking 5 weeks off per year, he would gross $72,000 per year. It is easy for one to assume that he earns $50,000 per year. It is also easy to conclude that his reported income is not accurate. * * *
She further asserted:
* * * Though it took three years and an enormous investment on [appellee's] part, [appellant] finally stipulated to both Learning Enrichment and St. Pius schools. [Appellant] refused to agree to this arrangement up until the last day of trial in this case, 37 months after the parties separated. * * *
 {¶ 54} Appellee also listed the reasons why shared parenting would not work: (1) the parents lack the ability to cooperate and make joint decisions; (2) the parents lack the ability to encourage the sharing of love, affection, and contact between the child and the other parent; (3) a history of spousal abuse or other domestic violence; (4) the geographic proximity of the parents to each other is not favorable; and (5) the guardian ad litem recommended against shared parenting. Appellee thus requested: (1) sole custody; (2) Loc.R. 27 parenting time be granted with the possible exception of the guardian's recommendation of one evening every other week; (3) appellant pay child support with imputed income between $50,000 and $85,000; and (4) an attorney fee award.
 {¶ 55} On January 24, 2003, the trial court issued its decree. The court, in a thorough and detailed decision, concluded that Olivia's best interests would be served by designating appellee as the residential parent and legal custodian. The court stated:
* * * The record is replete with evidence that [appellant] and [appellee] cannot share jointly in the decision-making process regarding the best interests of Olivia. They cannot agree on minor issues or major issues. Additionally, the history of domestic violence and the propensity for future violence in this case results in the inescapable conclusion that shared parenting would have no chance of success, and would only result in continuing turmoil and stress for the parties and the child.
* * * [Appellee] has demonstrated that she has the capability to make sound decisions in Olivia's best interests, including the major issue in this case of choosing an appropriate school under the circumstances. She chose a school that is reputable, low cost, and equidistant from the homes of both parents, and one that allows Olivia to remain with the teachers and friends she has been with for many years. It would be traumatic to Olivia for this Court to remove her from the school she has attended for most of her life, and it would serve no purpose whatsoever. [Appellee] also displays logical and sound reasoning for the parenting arrangement that is in Olivia's best interests, which plan allows for regular contact with both parents, minimizes Olivia's travel time, and minimizes her exposure to tense situations between her parents.
Although [appellant] obviously believes his decisions and positions regarding Olivia are in her best interests, an objective view based upon the evidence is that his extremely troubled relationship with [appellee] to a great extent precludes his ability to make decisions that are in the best interests of the child. His proposed parenting plan for Olivia by clear and convincing evidence is not in Olivia's best interests. Although [appellant] obviously loves Olivia unconditionally, his demands and positions regarding her schooling, which on the surface at least constitute the essence of this litigation, are unrealistic and would be a detriment to the child. His plan proposes that Olivia be removed from a school which she attended for most of her life, a school in which she thrives, and by court order be placed in a school that is near his home but forty miles from her mother's home, requiring her to be driven eighty miles a day and costing in excess of $10,000 annually, which neither party can afford. It is commendable that a father centers his life around his young child and be willing and desirous to devote so much of his time and effort to her, as [appellant] has done. It is revealing to observe his refusal, however, to allow Olivia to participate in activities that she desires and that are most likely to be in her best interests such as tap/ballet class, because he doesn't want to give up his time with her.
C. The GAL's parenting time plan basically is in the bestinterests of the child. The GAL's plan was proposed after thorough investigation and involvement in this case. It also makes sense from the standpoint of resolving the significant issues in this case, because (a) it insures regular contact between the child and both parents, (b) it gives the child a" home base," and (c) it prevents the parents from having substantial face-to-face contact.
(Emphasis sic.)
 {¶ 56} With respect to parenting time, the court ordered that appellant have the child every other Friday from after school, about 3:00 p.m., until the following Sunday at 6:00 p.m. The court ordered as follows concerning weekday parenting time:
* * * Until Olivia begins the first grade, during weeks in which she is attending pre-school or kindergarten, [appellant] shall have Olivia every other Tuesday evening (immediately before the weekend during which she will be with [appellee]) from after pre-school (about 3:00 pm) until 6:00 pm * * *. Until Olivia begins the first grade, during weeks in which she is attending pre-school or kindergarten, [appellant] shall have Olivia every other Thursday evening (immediately after the weekend during which she was with [appellee]) from after pre-school (about 3:00 pm) until 6:00 pm * * *. Upon Olivia beginning the first grade, such weekday parenting time shall terminate in the interests of Olivia spending more time with her studies and/or other activities. The parties shall mutually determine at that time, however, with the aid and advice of the GAL if necessary, whether it would [be] in the best interests of Olivia for her to continue weekday parenting time with [appellant], or spend that time on her school studies and/or other activities. Should the parties be unable to reach a mutual determination on this issue, this Court will make the determination in a hearing involving a rebuttable presumption that because of her change of age and school activities such weekday parenting time shall terminate.
 {¶ 57} The court ordered the following with respect to the holidays:
(1) Christmas: [Appellant] shall have Olivia every Christmas Eve from 10:00 pm until 9:00 pm, when he shall deliver her to [appellee]'s home, or the location she designates, provided the location is within Franklin County or its contiguous counties. [Appellee] shall have Olivia from 9:00 pm every December 24th until 10 AM December 26th. Commencing December 26th at 10:00 am, the parties shall revert to the weekday and weekend plan * * *.
(2) New Years: The parties shall alternate New Years Eve each year, with [appellant] having Olivia from 3:00 pm on December 31st until 3:00 pm on January 1st in the even-numbered years. The parties shall reverse this schedule in the odd-numbered years. * * *
* * *
(4) Thanksgiving: The parties shall alternate Thanksgiving Day, with [appellant] having Olivia in the odd-numbered years and [appellee] having her in the even-numbered years. Parenting time shall be from 9:00 am until 6:00 pm on Thanksgiving Day.
(5) Other Holidays: In odd-numbered years, [appellant] shall have Olivia on her birthday, Martin Luther King Day, Easter, and the Fourth of July, and [appellee] shall have Olivia on President's Day, Memorial Day, and Labor Day. In even-numbered years, the parties shall reverse this schedule. The holidays that fall on Monday shall begin on Monday at 9:00 am and end at 6:00 pm.
 {¶ 58} The court directed that Olivia continue to attend Learning Enrichment until she starts kindergarten in the fall of 2003. The court determined that appellee "shall be the residential parent for school placement purposes, and shall make all decisions relative to Olivia's schooling, including but not limited to curriculum and school district." The court also included in its judgment, the following directive: "Both parties are RESTRAINED under penalty of contempt from allowing any person, including themselves, to smoke tobacco anywhere in the presence of Olivia."
 {¶ 59} The court ordered appellee to pay for and to maintain medical insurance for Olivia "for as long as she has an employer-provided plan without set-off of child support." The court ordered appellant to pay $829.93 per month as child support based upon imputed income of $50,000 per year. The court further ordered appellant to pay $50,400[2] of appellee's attorney fees and costs.
 {¶ 60} Appellant filed a timely notice of appeal and appellee filed a timely notice of cross-appeal. For ease of discussion, we address appellant's assignments of error out of order.
 {¶ 61} In his fourth assignment of error, appellant asserts that the trial court erroneously designated appellee as Olivia's primary residential parent and legal custodian, and improperly rejected shared parenting. Appellant asserts that the trial court's decision is contrary to Olivia's best interests and is against the manifest weight of the evidence. Appellant maintains that the trial court designated appellee as the residential parent and rejected shared parenting solely to punish appellant for his refusal to settle the case.
 {¶ 62} Initially, we note that an appellate court will not reverse a trial court's decision to allocate parental rights and responsibilities when the record contains substantial credible and competent evidence to support the court's decision. SeeBechtol v. Bechtol (1990), 49 Ohio St.3d 21, syllabus; see, also, Davis v. Flickinger (1997), 77 Ohio St.3d 415, 418. Furthermore, a reviewing court should afford the utmost deference to a trial court's decision regarding the allocation of parental rights and responsibilities. See, e.g., Miller v. Miller
(1988), 37 Ohio St.3d 71, 74. Consequently, absent an abuse of discretion, a reviewing court will not reverse a trial court's decision regarding the allocation of parental rights and responsibilities. See, e.g., Bechtol, supra. When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. Blakemorev. Blakemore (1983), 5 Ohio St.3d 217, 219. Moreover, a reviewing court should defer to the trial court on matters of credibility because credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." (Emphasis sic.) Davis, at 419.
 {¶ 63} Although a trial court's discretion regarding the allocation of parental rights and responsibilities is broad, it is not absolute. Trial courts must follow the statutory procedures. Miller, at 74. When allocating parental rights and responsibilities, R.C. 3109.04(B)(1) requires trial courts to consider a child's best interests. In determining a child's best interests, R.C. 3109.04(F)(1) sets forth the factors that courts must consider:
(a) The wishes of the child's parents regarding the child's care;
(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;
(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
(d) The child's adjustment to the child's home, school, and community;
(e) The mental and physical health of all persons involved in the situation;
(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;
(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;
(h) Whether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; * * *
(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;
(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.
 {¶ 64} Moreover, when determining whether shared parenting would serve a child's best interests, a trial court must also consider the following factors:
(a) The ability of the parents to cooperate and make decisions jointly, with respect to the children;
(b) The ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent;
(c) Any history of, or potential for, child abuse, spouse abuse, other domestic violence, or parental kidnapping by either parent;
(d) The geographic proximity of the parents to each other, as the proximity relates to the practical considerations of shared parenting;
(e) The recommendation of the guardian ad litem of the child, if the child has a guardian ad litem.
 {¶ 65} In the case sub judice, the trial court considered all of the foregoing factors and determined that Olivia's best interests would be served by rejecting the shared parenting proposal and by designating appellee as Olivia's residential parent and legal custodian. After our review of the record, we find substantial evidence to support the trial court's decision.
 {¶ 66} First, with respect to the child's parents' wishes, the court evaluated the parents' desires regarding how to make decisions concerning the child, how to allocate time spent with the child, and where to send the child to school. The court stated:
a. Decision-Making: [Appellee] testifies that there should be one decision-maker regarding Olivia because she and [appellant] disagree on almost all aspects of Olivia's care, which results in conflict and places Olivia in turmoil. * * * [Appellee] requests that she be named the sole residential parent and legal custodian. * * *
[Appellant]'s proposed shared-parenting plan does not suggest how the parents' decision-making should be allocated. * * *
 {¶ 67} The court finds that, due to the manifest desire and/or inability of the parents to communicate and/or cooperate with one another regarding the best interests of the child, it is necessary that a sole parent be appointed as the decision maker.
b. Parenting Time: Presently, [appellant] picks Olivia up at school every weekday at 3:30 pm and drops her of at [appellee]'s place of employment at 6:30 pm except on Tuesday and Thursday nights when he keeps her overnight. Additionally, the parents alternate weekends, with [appellant]'s weekend companionship beginning Friday evening and ending Monday morning. [Appellee] testifies that she seeks a more normal schedule for Olivia than the existing arrangement. * * * She proposes that the parents alternate weekends from 6:00 pm Friday until 6:00 pm Sunday, which will allow Olivia to consistently start the school week from the same home every Monday morning. * * * She testifies that Olivia's parenting time with [appellant] should not be disruptive to the child's week so that she [is] able to go to the Thornville home and get a good night's rest at a reasonable hour. * * *
[Appellant]'s proposed "best plan" consists of a parenting time arrangement where he has Olivia every Tuesday and Thursday from 3:00 pm until the following morning at 9:00 am. * * * This arrangement is not acceptable to [appellee] because it would result in Olivia sleeping in a different house every night of the school week. * * * Both [appellee] and the GAL believe this arrangement would be disruptive to Olivia's life because she would not have one place to call her home, she would be exposed to the parents' differing parenting styles on alternating days, and she would be exposed to different bedtimes each night. * * * The Court agrees that this arrangement would place the child in undue stress and turmoil. The parents already unsuccessfully attempted a parenting arrangement immediately after their separation where Olivia was with each parent on a 48-hour rotation. * * * This arrangement was confusing to the child, she became clingy, stopped progressing in her cognitive development, began regressing to baby-like behavior, and seemed unhappy, apparently and understandingly because there was no structure and routine in her life due to living in two different places on an alternating basis. * * *
[Appellant] also proposes that he have companionship on alternate weekends from Friday after pre-school until the following Monday morning. * * * [Appellee] proposes that the weekends should end Sunday night to give Olivia a consistent start to school on Monday mornings. * * * The Court agrees that weekends with the visiting parent should end on Sunday evening in order to allow the child to begin the school week each Monday morning from the same home. The Court also believes, however, that when the child is in school, her parenting time can begin with her father after school on Friday.
The Court finds that it is in the best interests of the child to enjoy liberal parenting time with the non-custodial parent, but not so much time that it detracts from her school work, extracurricular activities, and quality parenting time with the custodial parent.
c. Schooling: Although the schooling of Olivia has been the core dispute on the surface between the parents, the issue of "control" appears to be the underlying cause of dispute and dissension in this high-conflict case.
[Appellee] has continuously proposed that Olivia continue at Learning Enrichment until she enters kindergarten at St. Pius School * * * in Reynoldsburg, Ohio in the fall of 2003. * * * She is on the waiting list to begin school there and then. * * * St. Pius has different tuition rates for Catholics and non-Catholics, and since Olivia is Catholic, tuition will be $143 a month. * * * St. Pius complies with the suggestions of both Doctor Arnold and the GAL that Olivia's school be equidistant from the residences of both parents. * * * In the event Olivia is unable to attend St. Pius for any reason, [appellee] proposes that Olivia attend Thornville Elementary that is less than a block from the Thornville home. * * *
* * *
Until trial, [appellant] has continuously proposed in his pre-trial filings that Olivia attend St. Joseph's Montessori for school near his home * * *. Tuition for St. Joseph's is almost $6,000 a year, which does not include before-school care, after-school care, summer, or care for the more than five weeks that the school is closed during the school year, all estimated to cost an additional $3,000-$5,000 per year. * * *
* * *
[Appellant] eventually conceded at trial that [appellee]'s plan for Olivia to continue at Learning Enrichment, where she has attended pre-school for four years, is in the best interests of Olivia, until she begins kindergarten at St. Pius in the fall of 2003.
The Court finds that [appellee]'s plan for placement and commencement of school clearly and obviously is in the best interests of the minor child.
The Court finds that had [appellant] made these common-sense concessions regarding the place and timing of Olivia's schooling at the beginning rather than at the end of litigation, several years of high-conflict litigation and many tens of thousands of dollars in legal fees could have been avoided, and used for the benefit of Olivia.
 {¶ 68} Next, the court found that the second R.C.3109.04(F)(1) factor, the wishes and concerns of the child, is inapplicable because Olivia is five years old. The court noted that "[t]he evidence shows that just as with most children, the child's desire would be to reside with both parents in the same household, and that she would not be able to `choose between them.'"
 {¶ 69} Turning to the third R.C. 3109.04(F)(1) factor, the child's interaction and interrelationship with her parents, siblings, and any other person who may significantly affect her best interests, the court found:
* * * [Appellant] and [appellee] shared equally in care-giving during the first few years of Olivia's life, with [appellant] spending substantially more time with the child and giving more care to the child than the typical father. It might even be said that for a limited period during Olivia's very early years he was the primary caregiver. He spent a considerable amount of time finding an appropriate day-care center; the safest seat belt for Olivia, and took many days off work to be with her when she was ill. In the last several years, however, [appellee] has been the primary caregiver.
Olivia is closely bonded with her mother and has a close and loving relationship with her brother Adam. * * * Olivia has a close relationship and much interaction with her Aunt Theresa, [appellee]'s sister; they have seen each other every other weekend since Olivia's birth. * * * Olivia also has a very good relationship with her "Grammy" ([appellee]'s mother) and Aunt Mary Anne ([appellee]'s other sister), both who see Olivia at least once a month, but usually more often. * * * Olivia has many friends within walking distance of the Thornville home and at her day care. * * *
Olivia is closely bonded with her father * * *. She has a very close relationship with and sees her paternal grandparents, the Petrees, regularly on Wednesdays. * * * The Petrees testified that [appellant] gives excellent care and is totally dedicated to Olivia, appropriately disciplines her, and has acted properly to provide the child a loving environment in his home; they also testified regarding the benefits of Olivia spending time with them. The Court finds the Petrees' testimony to be highly credible, and the time spent by Olivia with them to be of great value to her. [The child] also has a good relationship with [appellant]'s extended family, especially her cousins, with whom she loves to play. * * *
The Court finds that Olivia is closely bonded with both her paternal and maternal extended families.
 {¶ 70} Regarding the fourth R.C. 3109.04(F)(1) factor, the child's adjustment to her home, school, and community, the court found as follows:
* * * After [appellee] and [appellant] married, they lived in [appellee]'s Thornville home, and Olivia has lived there since birth. * * * She has had the same bedroom since she was an infant and a playroom on the first floor. * * *
Olivia has spent a great deal of time at [appellant]'s home on Lincoln St. but has little connection to the area and few friends in the immediate neighborhood. * * *
Learning Enrichment, where Olivia has attended pre-school since November 1998, is located in Pickerington approximately halfway between each of the parents' homes. * * * It has before-school, after-school, and summer programs. * * * Learning Enrichment also has transportation to St. Pius three miles away. * * * Olivia has made many friends at Leaning Enrichment and many of those friends are likely to continue in the before-school, after-school, and summer programs with her. * * *
Olivia is well adjusted to the community of Thornville. It is a very small community where everyone knows everyone's children. * * * She attends tap classes there, attends 4th of July festivities there, and enjoys the swimming pool and library which are both within walking distance of her home. * * *
The Court finds that Olivia is more adjusted and more comfortable in her mother's home than in her father's home.
 {¶ 71} The court next examined the fifth R.C. 3109.04(F)(1) factor, the mental and physical health of all persons involved in the situation. The court found:
* * * [Appellee] is in good physical and mental health. * * * There was no evidence regarding [appellant]'s physical health. [Appellee] testified that [appellant] has very erratic behaviors, evidenced by him being very easily upset and becoming violent with episodic rages where he talks to people when no one is there. * * * Leanna Collinsworth, [appellant]'s girlfriend for approximately six months in 2001, also testified that she has observed him talking to people who weren't there. * * * The audiotape [appellant] made of himself in his auto * * * evidences him talking to people who aren't there. Although the Court does not find it to be highly unusual for a person to talk out loud to himself when in a state of agitation or anger, evidence of such behavior may support other evidence of violent propensities or violence.
[Appellee] testified that since she went back to work after Olivia's birth, [appellant] has demonstrated obsessive and controlling tendencies regarding Olivia, including his insistence that he transport Olivia to and from pre-school every day, racing [appellee] to Learning Enrichment so he could pick Olivia up before she did, calling the pre-school to make sure [appellee] picked [the child] up, staying home on days that Olivia was sick when [appellee] had already taken the day off, and sleeping in a cot next to Olivia's crib. * * * She testified that [appellant] intimidates, harasses, bullies, and is violent to women. * * *
[Appellant] relies heavily on the report of Dr. Kevin Arnold, a witness of the Court. * * * Dr. Arnold's report, however, pre-dates a great deal of additional evidence in this case, because under their agreement after it was issued the parents were not permitted to submit any supplemental information to him. The additional evidence excluded from his report includes the recording of [appellant]'s taped verbal rage in his auto, the 800+ pictures he took of Olivia and [appellee] during the course of this litigation, and [appellant]'s undisputed abuse of Leanna. * * *
 {¶ 72} Turning to the sixth R.C. 3109.04(F)(1) factor, the parent more likely to honor and facilitate visitation and companionship rights approved by the court, the court found:
* * * [Appellee] has allowed [appellant] to have ongoing, frequent, and regular contact with Olivia when Olivia is with her. * * * [Appellee] testifies that she believes Olivia has the right to two loving and caring parents. * * * Contrariwise, [appellant] had Olivia for a period of three days after the incident of violent on June 18, 1999 between [appellant] and [appellee], and would not tell her where Olivia was during this time. * * *
[Appellant] testified that he believes [appellee] is systematically attempting to cut him out of Olivia's life as she allegedly did with her first husband. [Appellee]'s testimony on this issue is credible, however, and demonstrates that Adam's father never pursued an interest in Adam's life even when the parents were together, and it was his wish that he not see Adam in exchange for not having to pay support. * * * [Appellee] does not wish that [appellant] walk away from Olivia. * * *
[Appellee] testified that [appellant] has attempted to prevent her from participating in extracurricular activities with Olivia. * * * She testified he has scheduled Olivia for activities without informing her so that she could not attend or take Olivia when the activities took place during her companionship time, and has refused to agree to allow [appellee] to sign Olivia up for activities that encroached on his time. * * *
(Emphasis sic.)
 {¶ 73} The court noted the following regarding the seventh R.C. 3109.04(F)(1) factor, whether either parent has failed to make child support payments under a child support order:
* * * There is no Temporary Support Order in this case. [Appellant] has accepted responsib[ility] for payment of Olivia's pre-school expenses since June 1999, but has been current in his payments only two of the last thirty-two months. * * * The pre-school has sent at least four collection letters regarding delinquent day-care payments. * * *
 {¶ 74} The court found the eighth R.C. 3109.04(F)(1) factor, whether either parent has been convicted of or pleaded guilty to abuse or neglect of a child, inapplicable.
 {¶ 75} With respect to the ninth R.C. 3109.04(F)(1) factor, whether either parent has continuously and willfully denied the other parent visitation in accordance with a court order, the court noted that a visitation order did not exist.
 {¶ 76} The court found the tenth R.C. 3109.04(F)(1) factor, whether either parent is planning to establish a residence outside the state, inapplicable because neither parent plans to relocate outside of Ohio.
 {¶ 77} The court concluded that "an objective application of the statutory factors to the evidence favors [appellee] being appointed as the sole residential parent and legal custodian of Olivia." We note that the trial court fully evaluated the evidence presented at the trial and we believe that the record fully supports the court's factual findings. The court did not erroneously conclude that the R.C. 3109.04(F)(1) factors weighed in favor of designating appellee Olivia's sole residential parent and legal custodian.
 {¶ 78} The trial court also examined the R.C. 3109.04(F)(2) factors and determined that shared parenting would not serve Olivia's best interests. The trial court found as follows with respect to the first R.C. 3109.04(F)(2) factor, the ability of the parents to cooperate and to make decisions jointly:
* * * The evidence is clear and convincing that there is little possibility that joint decisions can be made by [appellant] and [appellee] regarding Olivia. They don't speak to each other and haven't had a direct verbal exchange in over a year. * * * The Court ordered them to communicate via e-mail and they have done so. * * * Their communication ability is so strained that [appellant] waited five days to tell [appellee] that he suspected that her son Adam, Olivia's brother, had molested her. * * * The suspicions proved to be unfounded.
Olivia's parents have disagreed on many issues, including the meaning of court orders, medical care, scheduling of appointments for Olivia, immunizations, payment for medical care, extracurricular activities, transportation, when and where transitions should take place, holidays, birthdays, and where and when Olivia should attend school. * * * Transitions where both parents are present are extremely hostile and stressful on Olivia, as observed by both parents and [appellant]'s parents. * * *
The parents are unable to communicate even on simple matters, including notification of doctor's appointments. [Appellant] has failed to notify [appellee] of doctor's appointments. * * * They are unable to schedule extracurricular activities without the assistance of a Court Order. * * * [Appellant] enrolled Olivia in extracurricular activities without [appellee]'s knowledge, including gymnastics, cheerleading, swimming, and music. * * * When [appellee] requested that [appellant] rearrange the parenting time schedule so Olivia could participate in a tap/ballet class, [appellant] refused and [appellee] had to file a motion in order to enroll Olivia in the class. * * *
[Appellant] made nineteen tapes (over 57 hours) of conversations throughout the course of this case, explaining that he made these tapes because he did not trust [appellee]. * * * He entered her property in an attempt to document" safety issues" he saw at her home, including growing poison ivy and dog feces. * * * Such "safety issues" do not appear to be motivated by genuine concerns for Olivia's safety, but rather to undermine [appellee] in the eyes of the Court.
* * * Dr. Arnold's report, which suggests the possibility of a shared parenting plan, predates and is not based upon much of the relevant evidence regarding the inability of the parents to cooperate regarding decisions concerning Olivia.
 {¶ 79} The court next examined the second R.C. 3109.04(F)(2) factor, the ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent:
The relationship between the parents is intense. [Appellant] has made notes regarding which parent's lap Olivia chose to sit on, taped conversations between Olivia and himself in which Olivia states she doesn't miss her mommy, and taped Olivia crying when he dropped her off at the end of his parenting time. * * * Following the parents' separation on June 19, 1999, [appellant] did not tell [appellee] where Olivia was nor did he allow [appellee] to have contact with Olivia for three days. * * *
[Appellee] testified that [appellant] has intimidated, assaulted, and threatened her, within the last year calling her "a bitch" and "a fucking bitch," and has threatened to kill her. * * * His former girlfriend testified credibly that he told her he has fantasized that "Beth the fucking bitch" would get run over by a car or have a heart attack and die; and that if he "ran over her with [his] car" he "would not even apologize for it." * * *
 {¶ 80} Turning to the third R.C. 3109.04(F)(2) factor, any history of, or potential for, child abuse, spouse abuse, other domestic violence, or parental kidnapping by either parent, the court found as follows:
[Appellee] testified that [appellant] committed seven instances of domestic violence against her between November 1998 and June 1999, with the final act of violence being committed on June 19, 1999, triggering the separation and divorce. * * * [Appellant] testified that he and [appellee] had a very stormy romance and marriage. * * * [Appellant] corroborated three of these instances of violence and testified to two additional incidences of violence between him and [appellee]. * * * [Appellant]'s stepfather testified that [appellant] told him of physical altercations between [appellant] and [appellee] other than the June 19, 1999 incident, that [appellant] and [appellee] had a "strained relationship" for an extended period of time, and that [appellant] had told him of "loud instances of unhappiness." * * * Leanna testified to three incidents of violence committed against her by [appellant] during their short relationship. * * * [Appellant] did not dispute her testimony on these incidents of violence. The Court finds Leanna to be a credible witness, even considering the fact she has been prosecuted for falsification. Both Leanna and [appellee] testified that [appellant] drinks regularly, and Leanna testified that she witnesses him doing cocaine. * * * [Appellant] denies any such use of drugs and the Court makes no finding regarding this issue. The Court finds that [appellant]'s relationship with Leanna did not adversely affect Olivia.
[Appellee] is 5'2" and weighed approximately 110 pounds at the time of the domestic violence incidents; [Appellant] is 5'10" and weighed approximately 220 pounds. * * * [Appellee] testified that she did not call the police for any of the violent incidents before the June 19, 1999 incident because she believed that [appellant] would follow through on his threats to use his position and his family's position to take Olivia away from her. * * *
[Appellee] testified that since their separation, [appellant] has continued following and stalking her, calling her repeatedly at work, jamming up her voice mail at work with messages, swearing and yelling at her over the phone and during transitions, taking pictures of her and entering her property without her consent. * * * She testified that [appellant] threatened to kill her, break her "fucking neck," and run over her with his car. * * * [Appellee] testified that because of these incidents of violence, she is afraid to be alone with [appellant] and has insisted that all transitions take place in a public place or that she has someone accompany her to the transitions. * * *
[Appellant] is a graduate of the police academy, a member of the National Rifle Association, and a gun owner who possess[es] several weapons, including automatic handguns and a rifle. * * * He was seen carrying a revolver in the glove compartment of his vehicle by more than one witness. * * *
Both parties claim that the other party was the aggressor in the violent incidents. The evidence shows that [appellant] was the aggressor and [appellee] was the victim.
 {¶ 81} The court also examined the fourth R.C. 3109.04(F)(2) factor, the geographic proximity of the parents and the practical considerations of shared parenting, and found:
* * * The parents live about forty miles apart. * * * Both parents live approximately twenty miles from Olivia's day care and St. Pius. * * * Until the last day of the trial, three years after the parents separated, [appellant] insisted that Olivia attend St. Joseph's which is less than a mile from his home and more than 40 miles from [appellee]'s home. * * *
Under the current parenting arrangement Olivia has to drive more than 80 miles in the car every day of the week, she does not get home until approximately 7:15 pm., and then must have dinner and take a bath between 7:30 pm and 9:00 pm when she goes to bed. * * * This schedule prevents her from having any quality time with her mother on weeknights, prevents her from going to bed any earlier than 9:00 pm on school nights, and prevents her from engaging in any extracurricular activities with her mother during the week. * * *
 {¶ 82} With respect to the fifth R.C. 3109.04(F)(2) factor, the guardian ad litem's recommendation, the court found:
The GAL testified that both of Olivia's parents love her, and that she loves both of her parents. The GAL forcibly argues against shared parenting. * * * He unequivocally and correctly declares that the parents have not been able to work together, are not capable of working together for the best interests of Olivia — and that shared parenting will not work in this case. * * * He testified that [appellant] and [appellee] are each" parenting separately" and not "co-parenting." He testified that in this case more than in just about any other case in which he has served as GAL, the parents have not been able to work together. * * * The GAL supports [appellee]'s request for sole custody and believes that contact between the parents should be minimized. * * * His opinion specified in both his Reports did not change, even after listening to all the evidence presented by both sides at trial. * * * In fact, he testified that he affirmatively looked for evidence at trial that might change his mind and he did not hear any such evidence. * * *
After hearing all the evidence, the GAL is of the opinion that it is critically important in this case that one parent and one parent only have the legal authority to make decisions regarding Olivia's health, education, and welfare. * * *
The GAL's Report emphasizes that Olivia is a happy, well-adjusted, and delightful child, and the Court finds that both parents have contributed substantially to Olivia's lovely personality. The GAL testified that Olivia is in the middle of the continuing animosity and disputes between her parents, however, and that she is vividly aware of this turmoil.
The Court finds that the continuing animosity and turmoil between the parents has substantially contributed to Olivia's detriment, which may not manifest itself until later in life.
The GAL testified that Olivia needs a "home base" and that her home logically is [appellee]'s home in Thornville because Olivia has known that home as her home from birth. * * * He testified that the Thornville home will provide consistency and comfort to Olivia and that she views it as her home. He testified further that although she is comfortable at her father's home, she does not view it as her home. The GAL testified he does not think there is any evidence to substantiate [appellant]'s belief that [appellee] intends to terminate his relationship with Olivia and "trick him into trouble." * * * He testified he does not believe it is [appellee]'s intention to remove Olivia from the jurisdiction. * * * The GAL recognizes that [appellant] has been an active father and is closely bonded with Olivia and supports his right and need to companionship time. * * *
The GAL reviewed both parents' proposed parenting plans and endorses [appellee]'s plan as the one that would serve Olivia's best interests. * * * He is concerned about the long days that Olivia is having under the present companionship arrangement and the amount of travel she must do, and believes that a parenting arrangement that minimizes the "back and forth" is in Olivia's best interest. * * * He testified that [appellant]'s plan for overnights at his home every Tuesday and Thursday night would create too much "back and forth" for Olivia. * * * He recommends one overnight a week at most or even one overnight in alternating weeks at [appellant]'s house in order to minimize Olivia's time spent in the car and also to minimize the "back and forth" between the parents. * * *
 {¶ 83} The trial court concluded, "by evidence beyond a reasonable doubt," that shared parenting would not serve Olivia's best interests.
 {¶ 84} Again, our review of the record reveals that the trial court fully considered all of the evidence and properly applied the evidence to the statutory factors. We again note that the trial court issued a thorough and detailed decision. We believe that substantial evidence, including the evidence cited herein, supports the trial court's judgment that shared parenting would not serve Olivia's best interests.
 {¶ 85} We recognize that appellant asserts that the evidence adduced at trial does not support the trial court's decision. Appellant's argument, however, is premised upon evidence that the trial court discredited. Appellant asserts that, in order for the trial court to reject shared parenting and to decide that appellee should be the sole residential parent, the court:
* * * [H]ad to reject the court's own expert witness, Dr. Arnold, and his professional report; it had to completely vilify [appellant] and refuse to acknowledge the critical role [appellant] played in Olivia's life; and it had to raise a convicted liar to the level of Mother Theresa so that her uncorroborated testimony could be believed. * * *
 {¶ 86} At this juncture, we take the opportunity to note that issues regarding witness credibility rest with the trial court. See, e.g., Davis, supra. An appellate court is ill-suited to judge a witnesses' credibility simply by reviewing the witness' testimony. Therefore, to the extent that appellant's arguments rest upon witness credibility, we must defer to the trial court's credibility determination. See, e.g., Davis, supra.
 {¶ 87} With respect to appellant's argument that the trial court "vilified" him, we presume that he refers to the court's finding that he committed acts of domestic violence. Our review of the record, however, reveals that the evidence adduced at trial, if believed, supports the trial court's findings. We have no basis to overturn the trial court's findings in this regard.
 {¶ 88} Appellant further complains that the court inappropriately credited Collinsworth's testimony that appellant abused her. We reject appellant's argument. We note that the trial court found Collinsworth credible, despite her criminal past. Again, witness credibility is generally a matter reserved for the trier of fact.
 {¶ 89} Appellant additionally argues that the trial court ignored the testimony that he played a crucial role in Olivia's life. We note, however, that the trial court did in fact recognize the important role appellant played and continues to play in Olivia's life. The trial court even noted that appellant arguably served as Olivia's primary caregiver. Thus, we do not believe that the trial court failed to recognize the important role appellant played in Olivia's life, but, rather, the trial court found that, in spite of that role, appellant's other actions demonstrated that he did not appear motivated to always act in Olivia's best interests. We hasten to add that by no means do we intend to minimize the care appellant has shown for Olivia and the obvious love that he has for his child. Appellant's adoration of his child is admirable. The trial court found, however, that appellant, until the time of trial, refused to cooperate with appellee in devising a parenting plan to serve Olivia's best interests.
 {¶ 90} Appellant also asserts that the trial court erroneously rejected Dr. Arnold's recommendation that the court implement a thoroughly-detailed shared parenting plan. We disagree with appellant. The court fully explained its reasons for rejecting Dr. Arnold's recommendation. The court observed that Dr. Arnold filed his report before many of the events testified to at trial, including appellant's acts of abuse against Collinsworth and appellant's excessive photographing of appellee and Olivia. Moreover, we note that, although Dr. Arnold ultimately did recommend shared parenting, his report contains numerous findings that the parties' relationship and attempts to communicate regarding Olivia's best interests remain hostile and will continue to be so in the future. Dr. Arnold surmised:
* * * The research * * * indicates that there is reason to believe that these two parents will continue to experience high degrees of both conflict and hostility toward one another when trying to work together, even on their daughter's needs. When these conflicts and hostilities arise, I predict that the results will include exposure of Olivia to the conflicts and hostilities, boding poorly for her potential to adjust healthily to the divorce. * * *
 {¶ 91} Furthermore, and most important, the responsibility of determining what specific parenting structure will serve a child's best interests rests with the trial court, not a psychologist's report and recommendation. While a trial court may rely upon information contained in a psychologist's report to determine a child's best interests, nothing requires a court to blindly follow a psychologist's recommendation. Instead, a psychologist's report or recommendation is but one factor that a court should consider. Trial courts must make the ultimate decision in child custody controversies and courts must remain free to accept or to reject a psychologist's recommendation.
 {¶ 92} Appellant also disputes the trial court's finding that the parties have not been able to cooperate and make joint decisions regarding Olivia's care. Again, this is a factual issue reserved to the trial court. We find nothing in the record to indicate that the court's finding is contrary to the evidence. Indeed, Dr. Arnold recognized that the parents are unable to amicably cooperate and make joint decisions. Additionally, as the trial court noted, the guardian ad litem, who has approximately 20 years of experience and has worked on hundreds of cases, stated: "[I]n this case more than in just about any other case in which he has served as GAL, the parents have not been able to work together."
 {¶ 93} While it is abundantly apparent that both parties love Olivia and desire physical custody as much as possible, the trial court found that Olivia's best interests are served by designating appellee the residential parent and legal custodian. The trial court judge, who was involved in the parties' divorce proceeding for approximately three years, is in a better position than this court to consider all of the evidence, weigh the parties' credibility, consider the litigation history and the parties' actions when deciding what parenting arrangement best serves Olivia's interests. Based upon our review of the voluminous record in this matter, we cannot say that the trial court abused its discretion by designating appellee as Olivia's residential parent and legal custodian.
 {¶ 94} Appellant alternatively asserts that the trial court erred by not continuing the parties' parenting time arrangement that they had followed from the time of separation. Again, we disagree with appellant.
 {¶ 95} Both appellee and the guardian ad litem testified that the current arrangement exacerbated the hostilities between the parents and did not serve Olivia's best interests. The trial court found that, under the parents' current arrangement, Olivia: (1) is in the car for more than 80 miles every day of the week; and (2) does not arrive home until approximately 7:15 p.m., and then must have dinner and take a bath between 7:30 p.m. and 9:00 p.m., when she goes to bed. The court concluded that the current arrangement prevents Olivia "from having any quality time with her mother on weeknights, prevents her from going to bed any earlier than 9:00 pm on school nights, and prevents her from engaging in any extracurricular activities with her mother during the week."
 {¶ 96} The trial court was well aware of the parents' current arrangement when it evaluated the best interest factors and the shared parenting factors. Nevertheless, the court obviously concluded that continuing the current arrangement would not serve Olivia's best interests. We find no abuse of discretion.
 {¶ 97} At this point we take the opportunity to note that, in spite of the tumultuous nature of the parties' relationship, both appellant and appellee are loving parents that care deeply for Olivia. The record indeed supports this conclusion. Unfortunately, however, the trial court was faced, as it often is, with the unenviable task of selecting one parent to serve as Olivia's primary caregiver. These types of cases present some of the most difficult and heart wrenching issues that courts are called to decide. Nevertheless, a court must fulfill its duty and decide the issue in the best manner it is humanly possible to do. We sincerely hope, for Olivia's well-being, that the parties recognize the importance of maintaining a civil and respectful relationship with each other and with their child.
 {¶ 98} Accordingly, based upon the foregoing reasons, we hereby overrule appellant's fourth assignment of error.
 {¶ 99} In his first assignment of error, appellant asserts that the trial court erred by failing to adopt the parties' stipulations concerning the issues of school placement and the Christmas parenting time schedule. Appellant asserts that the parties agreed that Olivia would attend St. Pius, yet the trial court failed to order that she attend St. Pius. Appellant also contends that the trial court erred by failing to incorporate the parties' stipulation that Loc.R. 27 would govern Christmas parenting time.
 {¶ 100} Appellee maintains that the parties did not enter into a stipulation regarding school placement and Christmas parenting time. Instead, the only stipulations were the written stipulations filed July 10, 2002. She asserts that the parties contested and fully litigated school placement and Christmas time during the five-day trial.
 {¶ 101} In reply, appellant contends that the parties verbally stipulated that the child would attend St. Pius. He refers to the following excerpt from the transcript:
THE COURT: We have an agreement regarding St. Pius?
MR. KEMP: That's correct, Your Honor.
(Tr. Vol. V, at 285.) Appellant notes that appellee's counsel did not object. Regarding Christmas parenting time, appellant points out that appellee's counsel stated: "Harold, we're happy to stipulate to Rule 27." (Tr. Vol. V, at 143.)
 {¶ 102} Initially, we note our disagreement with appellee that only written stipulations are valid and binding. Parties may enter into binding oral stipulations. See In re Fetzer (1997),118 Ohio App.3d 156, 164; Bispeck v. Battin Ins. Agency, Inc.
(June 7, 1985), Trumbull App. No. 3453, citing Steadley v.Montanya (1981), 67 Ohio St.2d 297; Schwartz v. Leiser (App. 1957), 76 Ohio Law Abs. 222; Peters Motors, Inc. v. Rodgers
(1954), 161 Ohio St. 480. See, also, Whitten v. Munson Twp. Bd.of Trustees (June 11, 1993), Geauga App. No. 92-G-1725. Thus, if the record reveals that the parties verbally stipulated that Olivia would attend St. Pius, or that Loc.R. 27 would govern Christmas parenting time, the stipulations may be valid and binding.
 {¶ 103} In the case at bar, appellant and appellee initially disagreed as to the school that Olivia would attend. Throughout the entire proceedings, save the last days of trial, appellant advocated that Olivia attend St. Joseph. Appellee continually proposed that Olivia attend St. Pius. Appellee further stated, however, that if Olivia could not attend St. Pius due to enrollment or monetary issues, she preferred Thornville Elementary.
 {¶ 104} Our review of the record indicates that, although both parties agreed that St. Pius would be an appropriate school, nothing indicates that both parties agreed that St. Pius is the only school that Olivia could attend. Instead, the record reveals that appellee wanted the option of Thornville Elementary as an alternative school, in the event that St. Pius became cost prohibitive or that Olivia could not enroll for other reasons. Therefore, we conclude that the trial court did not err by failing to include in its judgment an order that Olivia attend St. Pius.
 {¶ 105} The record is unclear, however, as to whether the parties agreed that Loc.R. 27 would govern Christmas parenting time. Appellant requested that time be allocated pursuant to Loc.R. 27 — alternating Christmas Eve one year, Christmas Day the next. Appellee requested that she be allowed to have Olivia every Christmas morning. Under her plan, Olivia would always spend Christmas Eve with appellant because "the Newbolds have always celebrated Christmas, on Christmas Eve. And my family's always celebrated on Christmas day." (Tr. Vol. I, at 70.) Appellee claims that her plan is "more in conformity to what our families have traditionally done in the past." (Tr. Vol. I, at 70.) When appellee's counsel questioned her about appellant's proposed plan, however, appellee stated that she did not object to appellant's plan that "all other time periods and provisions" of Loc.R. 27 shall apply. (Tr. Vol. I, at 66.)
 {¶ 106} Our review of the record does not reveal that the parties explicitly agreed that Loc.R. 27 would apply. Therefore, because the record does not clearly show that the parties stipulated that Loc.R. 27 would govern holiday parenting time, we believe that the trial court did not err by failing to incorporate such a stipulation. Appellant nonetheless contends that appellee's counsel's statement that he would be "happy to stipulate to Loc.R. 27" shows that the parties agreed that Loc.R. 27 would govern holiday parenting time. A contextual reading of appellee's counsel's statement, however, leads us to believe that counsel's statement was intended to stipulate as to what the rule provides, not that appellee agreed that Loc.R. 27 should govern holiday parenting time.[3] Thus, the trial court could fashion Christmas parenting in the manner it believed best served Olivia's interest.
 {¶ 107} Accordingly, based upon the foregoing reasons, we hereby overrule appellant's first assignment of error.
 {¶ 108} In his second assignment of error, appellant raises several issues. First, he asserts that the trial court erred by creating rebuttable presumption that weekday parenting time would not be in Olivia's best interest once she started school and that, by doing so, the court engaged in an anticipatory termination of appellant's weekday parenting time rights. Appellant complains that the trial court's order "was a clear violation of law and an abuse of discretion." He argues that the court, by stating that appellant's weekday parenting would be rebuttably presumed to not be in the child's best interests, failed to consider R.C. 3109.051(D).
 {¶ 109} Second, appellant asserts that the trial court should have maintained the existing parenting time schedule because Olivia was adjusted to the schedule and was thriving.
 {¶ 110} Third, appellant contends that the trial court failed to comply with R.C. 3109.051(D) in structuring a visitation order. He asserts that the court, without analyzing or mentioning the R.C. 3109.051(D) factors, deviated from the Loc.R. 27 parenting time guidelines by awarding appellee every Christmas morning and by eliminating appellant's one-half of the summer and winter breaks.
 {¶ 111} In response, appellee asserts that appellant incorrectly interprets the trial court's order regarding weekday parenting time. Appellee contends that the court ordered a two-step process in order to resolve the issue of weekday parenting time when Olivia begins the first grade: (1) first, the parties must attempt to mutually agree whether weekday parenting time will serve Olivia's best interests; and (2) if the parties are unable to agree, the court will hold a hearing. At the hearing to determine whether weekday parenting time will serve Olivia's best interests, the trial court stated that it will employ a rebuttable presumption that weekday parenting will not serve Olivia's best interests. Appellee further asserts that the court was not required to recite the R.C. 3109.051(D) factors.
 {¶ 112} When a trial court does not enter a shared parenting order, R.C. 3109.051(A) requires the court to "make a just and reasonable order or decree permitting each parent who is not the residential parent to have parenting time with the child at the time and under the conditions that the court directs, unless the court determines that it would not be in the best interest of the child to permit that parent to have parenting time with the child[.]" The statute further requires the court, "[w]henever possible," to structure parenting time so as to "ensure the opportunity for both parents to have frequent and continuing contact with the child, unless frequent and continuing contact by either parent with the child would not be in the best interest of the child."
 {¶ 113} R.C. 3109.051(D) sets forth the non-exclusive list of factors that a court must consider in determining whether a grant of visitation is in a child's best interest. See R.C.3109.051(C); Braatz v. Braatz (1999), 85 Ohio St.3d 40, 45. The statute provides:
(D) In determining whether to grant parenting time to a parent * * *, in establishing a specific parenting time or visitation schedule, and in determining other parenting time matters * * *, the court shall consider all of the following factors:
(1) The prior interaction and interrelationships of the child with the child's parents, siblings, and other persons related by consanguinity or affinity, and with the person who requested companionship or visitation if that person is not a parent, sibling, or relative of the child;
(2) The geographical location of the residence of each parent and the distance between those residences, and if the person is not a parent, the geographical location of that person's residence and the distance between that person's residence and the child's residence;
(3) The child's and parents' available time, including, but not limited to, each parent's employment schedule, the child's school schedule, and the child's and the parents' holiday and vacation schedule;
(4) The age of the child;
(5) The child's adjustment to home, school, and community;
(6) If the court has interviewed the child in chambers, pursuant to division (C) of this section, regarding the wishes and concerns of the child as to parenting time by the parent who is not the residential parent or companionship or visitation by the grandparent, relative, or other person who requested companionship or visitation, as to a specific parenting time or visitation schedule, or as to other parenting time or visitation matters, the wishes and concerns of the child, as expressed to the court;
(7) The health and safety of the child;
(8) The amount of time that will be available for the child to spend with siblings;
(9) The mental and physical health of all parties;
(10) Each parent's willingness to reschedule missed parenting time and to facilitate the other parent's parenting time rights, and with respect to a person who requested companionship or visitation, the willingness of that person to reschedule missed visitation;
(11) In relation to parenting time, whether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of the adjudication; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;
(12) In relation to requested companionship or visitation by a person other than a parent, whether the person previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether the person, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of the adjudication; whether either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent previously has been convicted of an offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that the person has acted in a manner resulting in a child being an abused child or a neglected child;
(13) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;
(14) Whether either parent has established a residence or is planning to establish a residence outside this state;
(15) In relation to requested companionship or visitation by a person other than a parent, the wishes and concerns of the child's parents, as expressed by them to the court;
(16) Any other factor in the best interest of the child.
 {¶ 114} R.C. 3109.051(F)(2) further requires each common pleas court to adopt standard parenting time guidelines. The statute provides, however, that a court possesses "discretion to deviate from its standard parenting time guidelines based upon factors set forth in division (D) of this section."
 {¶ 115} In general, trial courts possess considerable discretion when structuring parenting time schedules. See Evansv. Evans (July 27, 1994), Hamilton App. No. C-920914; see, also,Appleby v. Appleby (1986), 24 Ohio St.3d 39, 41. In order for a reviewing court to find an abuse of discretion, it must conclude that the trial court's visitation order was unreasonable, arbitrary or unconscionable, and not merely an error of law or judgment. See Blakemore, supra; Shannon v. Shannon (1997),122 Ohio App.3d 346, 350. Moreover, in delineating visitation rights, trial courts must exercise their discretion in a manner that best protects the child's best interest. In re Whaley
(1993), 86 Ohio App.3d 304, 317.
 {¶ 116} In the case at bar with respect to appellant's first argument, we agree with appellee that the trial court did not engage in an anticipatory termination of appellant's weekday parenting time. Instead, the court provided that the parties shall attempt to mutually agree whether appellant's weekday parenting time will serve Olivia's best interests once she enters the first grade. The court did not definitively terminate appellant's weekday parenting time, but, instead, stated that, if the parties could not agree, it would conduct a hearing to consider the issue. The trial court, however, further stated that, if the hearing occurs, it will employ a rebuttable presumption that appellant's weekday parenting time would not serve Olivia's best interests. Thus, the trial court did not completely foreclose the possibility that appellant will have weekday parenting time with Olivia once she enters the first grade. We do not find it proper, however, for the trial court to include in its judgment the provision stating that, if the parties are unable to agree, the court will employ a rebuttable presumption that weekday parenting time will not serve Olivia's best interests. To the contrary, we believe that, if a future hearing regarding weekday parenting time becomes necessary, any modification of visitation or parenting time must comply with R.C. 3109.051. See Braatz, supra. Although it appears that the trial court was well intended and appears to be attempting to prevent future litigation, a trial court may not establish a presumption, apart from the requirements of the statute, that limits or restricts the right of one parent to advocate a parenting schedule that conforms to a child's best interest. Therefore, we hereby reverse that portion of the trial court's judgment that includes a rebuttable presumption that weekday parenting time will not serve Olivia's best interests.
 {¶ 117} Second, we disagree with appellant that the trial court abused its discretion by failing to maintain the parties' then existing parenting time schedule. As we explained in our discussion of appellant's fourth assignment of error, the trial court properly determined that the parties' previous arrangement would not serve Olivia's best interests.
 {¶ 118} Third, we agree with appellant that the trial court partially deviated from Loc.R. 27 without first considering the R.C. 3109.051(D) factors. Loc.R. 27 provides:
Visitation/Parenting time between the children and the non-residential parent shall take place at such times and places as the parties may agree, but will not be less than:
1. Weekends: Alternate weekends from Friday at 6:00 p.m. until Sunday at 6:00 p.m. This alternating weekend schedule shall not change, even when interrupted by holiday and birthday, summer and/or vacation visitation/parenting time. * * *
2. Weekdays: One weekday evening per week from 5:00 p.m. to 8:00 p.m. which shall be Wednesday unless otherwise agreed and designated herein as * * *.
As to holidays, the rule provides:
5. Holidays (includes birthdays): In odd-numbered years, mother has Spring Break, Memorial Day, Labor Day, and the first half of Winter Break. In odd-numbered years, father has Martin Luther King's Day, Fourth of July, Thanksgiving, and the second half of Winter Break. In the even-numbered years, the schedules are reversed.
* * *
c. Other days of special meaning, such as Religious Holidays, etc., (i.e., New Year's Eve and Day, Kwanzaa, Passover, Easter, Rosh Hashanah, Christmas Eve, Christmas Day) should be decided together, as follows: * * *
The rule provides as follows regarding summer break:
6. Summer: In odd numbered years, Mother shall have visitation/parenting time with the children the first half of the summer, and Father shall have visitation/parenting time with the children the second half of summer. This schedule reverses in even numbered years. * * *
 {¶ 119} The trial court ordered as follows with respect to Christmas:
* * * [Appellant] shall have Olivia every Christmas Eve from 10:00 am until 9:00 pm * * *. [Appellee] shall have Olivia from 9:00 pm every December 24th until 10 AM December 26th. Commencing December 26th at 10:00 am, the parties shall revert to the weekday and weekend plan * * *.
 {¶ 120} The court ordered the following with respect to summer break:
* * * The parties' weekend and weekday schedule shall remain in effect during the summer.
 {¶ 121} The trial court did not explicitly deviate from Loc.R. 27 when it allocated Christmas parenting time. The rule encourages the parties to agree upon Christmas parenting time. In the case sub judice, the parties apparently did not agree. Therefore, the trial court ordered the parties to continue to celebrate Christmas as they had in the past; however, it appears that the trial court did not consider R.C. 3109.051(D) when it structured Christmas parenting time. Neither the divorce decree nor the findings of fact and conclusions of law reference R.C.3109.051(D). Therefore, we believe that the record does not establish that the trial court considered R.C. 3109.051(D) and we remand the matter to the trial court so that it may consider the R.C. 3109.051(D) factors when structuring Christmas parenting time.
 {¶ 122} The trial court also deviated from Loc.R. 27 by not awarding appellant parenting time for one-half of the winter break and one-half of the summer break. Although R.C.3109.051(F)(2) provides a court with discretion to deviate from the rule, we find no explanation why the court deviated from the rule. Thus, our review as to whether the court abused its discretion is hampered. A deviation from the standard schedule is, of course, permitted if that deviation will serve the child's best interest. In the instant case, however, we note that the trial court did not specifically address this particular issue. Therefore, we remand the issue of winter break and summer break parenting time to the trial court for further consideration. On remand, the trial court should decide whether to allocate winter and summer break parenting time according to Loc.R. 27, and should consider R.C. 3109.051(D) if it chooses to deviate from the rule.
 {¶ 123} Accordingly, based upon the foregoing reasons, we hereby overrule in part and sustain in part appellant's second assignment of error.
 {¶ 124} In his third assignment of error, appellant asserts that the trial court erred by including in its order a restriction that prohibits any person from smoking tobacco products near Olivia when no evidence existed that Olivia had been subjected to cigarette smoke. Appellee "strongly endorses this order and believes it is in the best interest of all children," but concedes that it was not an issue in this case and no testimony was heard on the matter.
 {¶ 125} It does appear, after our review of the record, that the trial court issued this order to prohibit smoking near Olivia when no evidence was in fact presented to establish that anyone smoked near the child and when neither party requested this action. We believe, however, that the trial court's decision, if error, merely constitutes harmless error. Civ.R. 61 provides that courts "must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." See, also, Cappara v. Schibley (1999), 85 Ohio St.3d 403, 408. Appellant has not shown how the trial court's order affected his substantial rights.
 {¶ 126} Accordingly, based upon the foregoing reasons, we overrule appellant's third assignment of error.
 {¶ 127} In his fifth assignment of error, appellant argues that the trial court erred when it imputed income to him for child support purposes without any evidence regarding the R.C.3119.01(C)(11) factors. Appellee asserts that the record reveals that the trial court properly considered the R.C. 3119.01(C)(11) factors before it imputed income to appellant and that the evidence supports the court's finding.
 {¶ 128} Before income may be imputed to a parent, a court first must find that the parent is voluntarily unemployed or underemployed. Whether a parent is voluntarily underemployed is a question of fact for the trial court. See Rock v. Cabral
(1993), 67 Ohio St.3d 108, 112. Absent an abuse of discretion, a reviewing court will not disturb the court's factual determination. See id. Again, we note that the term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. See, e.g., id.; Blakemore, at 219. Moreover, "[t]he parent's subjective motivations for being voluntarily
unemployed or underemployed play no part in the determination whether potential income is to be imputed to that parent in calculating his or her support obligation." (Emphasis sic.)Rock, at 111.
 {¶ 129} In determining whether to impute income to a voluntarily underemployed parent, a court must consider the R.C.3119.01(C)(11)(a) factors:
(i) The parent's prior employment experience;
(ii) The parent's education;
(iii) The parent's physical and mental disabilities, if any;
(iv) The availability of employment in the geographic area in which the parent resides;
(v) The prevailing wage and salary levels in the geographic area in which the parent resides;
(vi) The parent's special skills and training;
(vii) Whether there is evidence that the parent has the ability to earn the imputed income;
(viii) The age and special needs of the child for whom child support is being calculated under this section;
(ix) The parent's increased earning capacity because of experience;
(x) Any other relevant factor.
Failure to consider all of the statutory factors constitutes an abuse of discretion. See Badovick v. Badovick (1998),128 Ohio App.3d 18, 23; Marsh v. Marsh (1995), 105 Ohio App.3d 747, 751
(revere when the court did not consider prevailing job opportunities or salary levels in the relevant community).
 {¶ 130} In the case at bar, the trial court imputed annual income to appellant in the amount of $50,000. The court found that appellant: (1) has 19 years of experience as an attorney; (2) is self-employed; (3) has the ability to generate compensation if he practiced law through a full workday and full workweek; (4) voluntarily leaves his office every mid-afternoon to spend time with Olivia; and (5) "shortens his workday substantially and interferes with his ability to earn compensation similar to that of other attorneys in similar law practices." The court also noted that if appellant billed four hours per day at $100 per hour, "an extremely conservative rate given his level of experience and taking into account a lower average rate due to his $45-60/hour rate for juvenile court appointments, and took four weeks of vacation annually, his gross income would be $96,000."
 {¶ 131} In our review of the record, we note that the trial court did not explicitly refer to R.C. 3119.01(C)(11) when it imputed income to appellant. Moreover, we are unable to determine whether the court considered all of the statutory factors. Therefore, we remand the matter to the trial court so that it may apply the appropriate statutory factors to determine whether, and in what amount, to impute income to appellant. We do not, however, imply that imputing income to appellant is improper. Rather, our holding merely recognizes that, to impute income, the court first must consider all of the statutory factors.
 {¶ 132} Accordingly, based upon the foregoing reasons, we hereby sustain appellant's fifth assignment of error.
 {¶ 133} In his sixth assignment of error, appellant argues that the trial court erred when it ordered that any medical insurance costs would be without set-off of child support. He asserts that the court lacked authority to dispense with the statutory requirement that a parent be given credit in a child support worksheet for the marginal, out-of-pocket costs necessary to provide for health insurance for the children who are subject to a child support order. Appellant notes that the court's divorce decree stated:
* * * [Appellee] shall pay for and maintain medical insurance for Olivia for as long as she has an employer-provided planwithout set-off of child support. If [appellee] does not have an employer-provided medical insurance plan for any reason, and [appellant] is enrolled in a plan of any kind, he shall provide the medical insurance for Olivia without set-off of childsupport. If neither party has an employer-provided medical insurance plan for Olivia, [appellee] will be responsible for obtaining a plan and the parties shall be equally responsible for the cost of the plan, and the other party shall reimburse the party paying for the plan within ten days of the due date of the premium.
(Emphasis added.)
 {¶ 134} Appellee asserts that the court gave her a credit on the child support worksheet for her out-of-pocket expenses that she paid for health insurance. She notes that the court's judgment requires appellant to pay $829.93 per month for child support and contends that the amount includes a set-off for health insurance, as demonstrated in the court's child support worksheet attached to the judgment entry. Additionally, the court stated in its findings of fact and conclusions of law: "[Appellee] should continue to maintain the health insurance for Olivia as she always has and her obligation should be included as part of the child support calculation."
 {¶ 135} A trial court possesses substantial discretion in determining child support obligations. Thus, a reviewing court will reverse such decisions only upon finding that the trial court abused its discretion. See Pauly v. Pauly (1997),80 Ohio St.3d 386, 390; Booth v. Booth (1989), 44 Ohio St.3d 142, 144. Once again, we note that, when we apply the abuse of discretion standard of review, we may not merely substitute our judgment for that of the trial court. See In re Jane Doe 1 (1991),57 Ohio St.3d 135, citing Berk v. Matthews (1990), 53 Ohio St.3d 161.
 {¶ 136} R.C. Chapter 3119 sets forth the procedures a trial court must follow when calculating a parent's support obligation. R.C. 3119.02 requires the trial court to calculate a parent's support obligation in accordance with the basic child support schedule set forth in R.C. 3119.02 through 3119.24. The amount of child support calculated using the schedule and worksheet is rebuttably presumed to be the correct amount of child support due. R.C. 3119.03. A trial court may, however, deviate from the worksheet amount if the amount would be unjust or unreasonable. See R.C. 3119.24(A)(1). If the court deviates from the worksheet amount, the court must enter in the record both the worksheet-calculated payment amount and its reasons for deviation from that payment amount. See DePalmo v. DePalmo (1997),78 Ohio St.3d 535, 538; Marker v. Grimm (1992), 65 Ohio St.3d 139,141-142.
 {¶ 137} In the case at bar, the trial court's child support worksheet computation afforded a set-off for health insurance costs, and, thus, it complies with statutory procedures. The court's final entry, however, conflicts with the procedure it used in calculating child support and also deviates from the child support guidelines. Therefore, we remand the matter to the trial court so that it may either: (1) resolve the conflict between the child support worksheet and its judgment entry; or (2) determine that a deviation is appropriate based upon the statutory factors.
 {¶ 138} Accordingly, based upon the foregoing reasons, we sustain appellant's sixth assignment of error.
 {¶ 139} In his seventh assignment of error, appellant argues that the trial court abused its discretion by awarding appellee $50,400 in attorney fees. He contends that: (1) the court did not comply with R.C. 3105.18(H); (2) the record does not establish that appellant has the ability to pay the fees; (3) no evidence exists that appellee needed the attorney fees to fully litigate her rights and adequately protect her interests; (4) appellee's fees are not reasonable; (5) the court improperly determined that appellant's "unreasonable positions regarding the key issues of this case substantially contributed to this extensive litigation"; and (6) attorney fees are not appropriate under R.C.2323.51 because the court did not hold a hearing to determine whether his conduct was frivolous.
 {¶ 140} Appellee contends that the court did not abuse its discretion by deciding to award attorney fees. She asserts that she had to borrow large sums of money to protect her interests. Appellee further argues that the court was not required to explicitly find that she would be able to fully litigate her rights without an attorney fee award, as long as the record supports the court's decision. Appellee also claims that her fees are reasonable.
 {¶ 141} R.C. 3105.18(H) provides that, in any divorce proceeding, a court may require one party to pay the other's reasonable attorney fees if the paying party has the means with to do so. The statute provides:
(H) In divorce or legal separation proceedings, the court may award reasonable attorney's fees to either party at any stage of the proceedings, including, but not limited to, any appeal, any proceeding arising from a motion to modify a prior order or decree, and any proceeding to enforce a prior order or decree, if it determines that the other party has the ability to pay the attorney's fees that the court awards. When the court determines whether to award reasonable attorney's fees to any party pursuant to this division, it shall determine whether either party will be prevented from fully litigating that party's rights and adequately protecting that party's interests if it does not award reasonable attorney's fees.
 {¶ 142} While R.C. 3105.18(H) permits the court to award attorney fees, "`the trial court must make the determination equitably and fairly to serve the ends of justice.'" Bowen v.Bowen (1999), 132 Ohio App.3d 616, 642. Additionally, the trial court's determination "should take into consideration * * * the earning abilities of the parties and the relative assets and liabilities of each." Birath v. Birath (1988),53 Ohio App.3d 31, 39. Generally, an appellate court may not reverse a trial court's decision regarding an attorney fee award absent an abuse of discretion. See Rand v. Rand (1985), 18 Ohio St.3d 356, 359;Bowen.
 {¶ 143} In the case at bar, the trial court found that appellee was entitled to attorney fees:
Counsel for both parties provided extraordinary professional services to their clients. [Appellee] requests that [appellant] be required to pay for some or all of her attorney's fees that exceed $100,000.
[Appellee]'s lead counsel Bradley Frick charged $200-$225 an hour for his representation, and his associate counsel charged $125-$150. * * * These rates are found to be reasonable given the caliber and experience of Attorney Frick and Attorney Goldson. * * * In view of the length of time this case has been litigated, the complexity of this case, the importance of this case to the litigants, the amount of time it takes to prepare a case for trial correctly after it has been pending for three years, and the level of expertise of the attorneys, the fees charged in this case are reasonable. * * *
* * *
This is a case that unquestionably should have been settled. The key dispute between the parties related to issues of control regarding the child's school * * *. It clearly was not in the best interests of the child to force litigation to such extent and at such great expense in order to necessitate a Court to have to resolve these matters, which are fairly obvious as to the best interests of the child. Although [appellant] testified that he wanted shared parenting all along, he did not file a motion for shared parenting nor a proposed shared parenting plan until the last three months of this three-year-old litigation. * * * Although [appellant] testified that he "could live with" Olivia starting school in the fall of 2003, he did not agree to it until the last minute of trial. * * * [Appellee] had to file three motions to compel discovery, all [of] which were granted and all of which deferred the fees issue until the final divorce decision.
The Court finds that although both parents may share some blame for not resolving these matters without extensive and expensive litigation, [appellant]'s positions on these school-related issues are untenable as clearly not being in the best interests of the child, and his positions unnecessarily and substantially prolonged this litigation. Additionally, there is evidence that protracted litigation may have been part of [appellant]'s legal strategy, or at a minimum it is evidence that he gave no due consideration to reasonable resolution of the case. His self-taped angry conversation with himself includes his directive to his legal counsel (who was not present) to call [appellee]'s counsel "every week I want you to start calling them every week." * * * Most significantly, however, the relatively simple issues in this case of shared parenting v. solo parenting, and school placement and commencement issues were contested to an extreme before [appellant] reluctantly conceded to [appellee]'s reasonable position on these matters at trial. The great bulk of this litigation was unnecessary and conducted at tremendous financial cost to [appellee], necessitating her borrowing substantial sums from her family.
 {¶ 144} The court additionally stated:
[Appellee]'s fees were both reasonable and necessary due to the complexity of this litigation, the difficulties encountered with discovery, the number of witnesses and issues raised throughout this litigation, the fact that major issues were not agreed upon until trial despite the best efforts of both counsel, and the fact that even after the major issues apparently were resolved the case nevertheless went to multi-day full trial. The Court finds under the statute that had [appellee] not been able to borrow much of her legal fees from her family, she would have been prevented from fully litigating her rights and the rights of the child, and that she is entitled to reimbursement of at least a portion of her legal fees so she can repay her family rather than have to repay them from current and future earnings. As indicated above, although the parties have similar income, the Court finds that [appellant]'s unreasonable positions regarding the key issues of this case substantially contributed to this extensive litigation, and he shall reimburse [appellee] $54,000 of her reasonable and necessary attorney's fees of $100,000.
 {¶ 145} After our review of the record, we agree with appellant that the trial court did not explicitly determine whether appellant has the ability to pay appellee's attorney fees. We do not agree with appellee that the court, by imputing income to appellant, impliedly found that appellant has the ability to pay attorney fees. Thus, we remand the matter to the trial court so that it may explicitly determine whether, in fact, appellant has the ability to pay appellee's attorney fees. Our decision should not, however, be construed as a comment on the underlying merits of the attorney fee payment issue.
 {¶ 146} Accordingly, based upon the foregoing reasons, we sustain appellant's seventh assignment of error.
 {¶ 147} In her cross-assignment of error, appellee argues that the trial court erred by failing to designate the attorney fee award as spousal support.
 {¶ 148} At this juncture, and in light of our disposition of appellant's seventh assignment of error in which we reverse and remand the attorney fee issue to the trial court for further consideration, we decline to review appellee's cross-assignment of error. In our disposition of the attorney fee issue, we concluded that the trial court had failed to enter appropriate findings before it awarded attorney fees to appellee. Accordingly, based upon the foregoing reasons we find appellee's cross-assignment of error has been rendered moot.
 {¶ 149} Having overruled appellant's first, third and fourth assignments of error; sustained appellant's fifth, sixth and seventh assignments of error; sustained in part and overruled in part appellant's second assignment of error; and declined to address appellee's cross-assignment of error, the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, is affirmed in part, reversed in part and this matter is remanded to the trial court for further proceedings in accordance with this opinion.
Judgment affirmed in part, reversed in part and remanded with instructions.
Kline, P.J., Abele and Harsha, JJ., concur.
Kline, P.J., of the Fourth Appellate District, sitting by assignment in the Tenth Appellate District.
Abele, J., of the Fourth Appellate District, sitting by assignment in the Tenth Appellate District.
Harsha, J., of the Fourth Appellate District, sitting by assignment in the Tenth Appellate District.
[1] Some additional excerpts from Dr. Arnold's report follow:
{¶ a} "Some of the responses to questions suggested that [appellee] might be unable to work together with [appellant] in the parenting of Olivia. [Appellee] viewed [appellant] as abusive and suggested that she did not feel safe with him. This finding was consistent with my observations of her during their conjoint session. She could not support their involvement in any interventions that might ameliorate their hostilities.
{¶ b} "Observations of the parents' participation in the conjoint session indicated that [appellee] and [appellant] engaged in unhealthy patterns of interaction, and that they would likely continue to conflict with each other if forced to communicate on a regular basis. These findings are consistent with tapes provided by [appellant], assuming they accurately reflect his conversations with her. Further, they are consistent with the findings on the Conflict Tactics Scale she completed.
{¶ c} "* * *
{¶ d} "* * * School placement appears to be more an issue of the parents' geographic location than of school appropriateness. In my opinion, the parents are likely caught up in their disagreements about school placement because of their more pervasive pattern of conflict and uncooperativeness toward one another. The placement in any school will lead to some difficulties on both parents' part regarding travel and access. * * * To serve Olivia's best interest, it is recommended that Olivia be placed in a specifically-named school that is equidistant, or as close to equidistant as possible, between the two parents' homes. * * * This recommendation is made to minimize Olivia's time spent in transport to or from school, to remove Olivia from the middle of her parents' conflicts over her school placement, and to foster for both parents a sense of having their time constraints considered."
[2] The record contains a discrepancy regarding the amount of attorney fees awarded to appellee. The divorce decree indicates that the award is in the amount of $50,400, while the findings of fact attached to the decree indicate that the award is in the amount of $54,000. However, because both parties use the $50,400 figure in their briefs we will use that figure herein.
[3] Additionally, as we note in our discussion of appellant's second assignment of error, Loc.R. 27 does not provide a set guideline for Christmas parenting time. Instead, the rule encourages the parties to agree on Christmas parenting time.